# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CARVANA CO. STOCKHOLDERS LITIGATION | ) ) | CONSOLIDATED C.A. No. 2020-0415-KSJM |

## MEMORANDUM OPINION

Date Submitted: March 14, 2022
Date Decided: June 30, 2022

Nathan A. Cook, BLOCK & LEVITON LLP, Wilmington, Delaware; Christine M. Mackintosh, Rebecca A. Musarra, GRANT & EISENHOFER P.A., Wilmington, Delaware; Ned Weinberger, LABATON SUCHAROW LLP, Wilmington, Delaware; Jason M. Leviton, Joel A. Fleming, Lauren Godles Milgroom, Amanda R. Crawford, BLOCK & LEVITON LLP, Boston, Massachusetts; Domenico Minerva, John Vielandi, David MacIsaac, LABATON SUCHAROW LLP, New York, New York; *Counsel for Co-Lead Plaintiffs Anthony Franchi, Construction Industry and Laborers Joint Pension Trust for Southern Nevada, St. Paul Electrical Construction Pension Plan, St. Paul Electrical Construction Workers Supplemental Pension Plan (2014 Restatement), and Retirement Medical Funding Plan for the St. Paul Electrical Workers.*

David E. Ross, Adam D. Gold, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Brian M. Lutz, GIBSON, DUNN & CRUTCHER LLP, San Francisco, California; Colin B. Davis, Katie Beaudin, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; *Counsel for Nominal Defendant Carvana Co.*

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; *Counsel for Defendants Ernest Garcia III and Ernest Garcia II.*

**McCORMICK, C.**

Carvana Co. ("Carvana" or the "Company") operates an e-commerce platform for buying and selling used cars. Ernest Garcia II ("Garcia Senior") and his son, Ernest Garcia III ("Garcia Junior"),[1] collectively control Carvana through their control of the majority of Carvana's voting stock. Garcia Junior is also Carvana's CEO, President, and Chairman.

The trading price of Carvana stock fell from $110 in February 2020 to less than $30 in March 2020 due to pandemic-related market volatility. While the trading price of Carvana's stock was depressed, Garcia Junior orchestrated a $600 million sale of common stock at $45 per share to investors whom he handpicked (the "Direct Offering"). The Garcias purchased $50 million of common stock in the Direct Offering. The public stockholders were excluded from the Direct Offering.

The stockholder plaintiffs brought derivative claims alleging that the Garcias breached their fiduciary duties to Carvana in orchestrating the Direct Offering at a price that was below fair value. Garcia Junior and the Company moved to dismiss for failure to plead demand futility and failure to state a claim. Garcia Senior joined in those motions and separately moved to dismiss for lack of personal jurisdiction. Garcia Senior's motions will be addressed in a separate decision. This decision denies Carvana and Garcia Junior's motions to dismiss for failure to plead demand futility and failure to state a claim.

---

[1] This decision refers to the individual Garcia defendants as Garcia Senior and Garcia Junior for clarity purposes. The court intends no disrespect.

# I.    FACTUAL BACKGROUND

Unless otherwise stated, the facts are drawn from the Verified Amended Derivative and Class Action Complaint (the "Amended Complaint").[2]

## A.    Carvana, Its Founder, And Its Board.

Nominal Defendant Carvana is a publicly traded Delaware corporation formed by the Garcias, which operates an e-commerce platform for buying and selling used cars through its subsidiary, Carvana Group, LLC.

Garcia Senior began his used-car empire after pleading guilty, in 1990, to felony bank fraud related to Charles Keating's Lincoln Savings & Loan scandal.  In 1992, he consented to a censure and permanent bar from "membership or employment or association with any New York Stock Exchange member or member organization."[3]

After a personal bankruptcy, Garcia Senior purchased the assets of a rental car company named Ugly Duckling Rent-a-Car System.  That entity was later reorganized into an entity called Ugly Duckling Corporation, which went public in 1996.  In 2002, Ugly Duckling changed its name to DriveTime Automotive Group, Inc ("DriveTime").  For convenience, this decision will refer to Ugly Duckling/DriveTime by its ultimate name, DriveTime.  Garcia Senior controlled DriveTime at all relevant times.

The Garcias formed Carvana in 2012 as a wholly owned subsidiary of DriveTime. Garcia Junior has served as Carvana's CEO, President, and Chairman since its formation.

---

[2] C.A. No. 2020-0415-KSJM, Docket ("Dkt.") 66, Verified Am. Deriv. & Class Action Compl. ("Am. Compl.").

[3] *Id.* ¶ 22.

DriveTime spun off Carvana in 2017 through an "Up-C structure," which created a publicly traded holding company that owns LLC units in the operating entity, Carvana Group, LLC.

Carvana has a dual-class capital structure. Its Class A shares are publicly traded and carry one vote per share. Its Class B shares carry ten votes per share, but only when held by the Garcias. The Garcias control 92% of Carvana's voting power through direct and indirect ownership of approximately 88.4 million shares of Carvana's Class B stock.

Carvana has a six-member board of directors (the "Board") comprising Garcia Junior, Gregory Sullivan, Ira Platt, Michael Maroone, Neha Parikh, and James "Dan" Quayle.

Relevant to this decision, the plaintiffs allege that Sullivan and Platt share particularly close ties with the Garcias, which are discussed in detail below in the legal analysis. The plaintiffs also allege that Sullivan and Platt each received over $1 million in director fees over the four years before the plaintiffs filed this lawsuit.

## B. The Direct Offering

Beginning in February 2020, stock markets throughout the world crashed after growing instability due to the COVID-19 pandemic. The trading price of Carvana's stock declined from a high of $110 on February 21, 2020, to a low of less than $30 on March 20, 2020.

Carvana's e-commerce model made it well-situated to weather the pandemic-fueled market volatility. Internal Carvana communications in early March suggest that Carvana did not need to raise capital with any urgency. On March 10, 2020, Garcia Junior rejected

3

a Goldman Sachs pitch to issue convertible debt. On March 13, 2020, Carvana's CFO, Mark Jenkins, sent a "Coronavirus and Macroeconomic Response Plan" to Board members.[4] The plan did not involve raising new capital but instead suggested cutting costs and streamlining operations in response to the market volatility. An update to that plan sent on March 20 was to the same effect.

Carvana provided good news to the market on March 24, 2020, announcing that it had secured a $2 billion finance agreement with Ally Financial ("Ally"), Carvana's most significant lender, allowing it to double its loan purchase program. In reaction, the trading price of Carvana stock rose 43%, from $35.80 at close on March 23 to $51.21 at close on March 24.

Carvana's communications with Ally further suggested that Carvana did not need to raise capital. On the morning of March 24, 2020, Carvana emailed Ally a "High Level Carvana Action Plan Overview" outlining a capital plan. That document noted that the Company had a "Survival Plan" previously sent to Ally as a downside case, reflecting that Carvana could operate for a year without raising equity or high-yield capital even in a severely challenging environment.[5]

Despite Carvana's seemingly sound financial position, Garcia Junior orchestrated a capital raise while the Company's stock was trading down. On the same day that Carvana announced the Ally agreement, March 24, Carvana began discussions with Greenoaks

---

[4] *Id.* ¶ 112.

[5] *Id.* ¶ 114.

Capital ("Greenoaks") and existing Carvana investors about a potential capital raise. Garcia Junior and Greenoaks initially discussed a convertible preferred stock issuance by Carvana in which Greenoaks would commit $200 million and the Garcias would commit a minimum of $50 million.

Garcia Junior played a central role in the effort by handpicking investors who would be permitted to participate in the non-public direct offering. As part of that process, Garcia Junior reviewed lists of "Holder Targets" with notes about their potential participation at $50 per share.[6]

Later that day, Carvana's management called an urgent Board meeting on less than an hour's notice. The Board met by phone that night for thirty-five minutes to discuss the potential capital raise. The Board was informed about a contemplated "preferred stock issuance to a 'potential new equity investor' who was 'seeking either 50% of this round of the transaction or $300–$500 million.'"[7] The Board planned to meet again in less than twelve hours, before the market opened, to vote on the transaction. Those plans were abandoned, however, once it became clear that a deal could not be approved before the market opened.

Garcia Junior and Carvana's General Counsel, Paul Breaux, continued working to advance a potential capital raise, actively negotiating with potential investors. On March 25, the Board met telephonically for an hour beginning around 11 a.m. and for twenty

---

[6] *Id.* ¶ 122.

[7] *Id.* ¶ 124 (quoting the Board minutes).

minutes later that evening. During each call, Garcia Junior updated the Board on a potential capital raise transaction, various alternatives being discussed, and steps to move forward. The minutes of these meetings do not indicate whether the Board discussed why a capital raise was necessary.

At Garcia Junior's instruction, Breaux and Carvana Vice President for Investor Relations, Mike Levin, worked through the night of March 25, 2020, to have a conceptual agreement in place by 7 a.m. on March 26.

The Board met twice telephonically on March 26, 2020. Neither Garcia Junior nor Quayle attended the first meeting, which lasted approximately 40 minutes. Breaux and Jenkins provided an update during that meeting regarding a potential equity transaction to raise capital.

Immediately after the first March 26 meeting, Jenkins circulated a slide deck of Carvana's COVID-19 response plan to the Board, stating that the business was prepared to handle an 80% reduction in sales volume for up to twelve months without requiring non-asset-based financing because the Company was implementing significant cost-cutting measures. The plan did not expressly reference a need for any additional capital, despite the efforts of the prior few days. The plan also noted that the Company would have $430 million in liquid assets as of the end of the quarter and that, even in a "Deep Stress Scenario," the Company expected to lose slightly less than that through the end of the first

6

quarter of 2021, indicating that the Company believed its cash on-hand was sufficient for the foreseeable future.[8]

The Board held the second March 26 meeting approximately 40 minutes after Jenkins circulated the plan. Garcia Junior, Breaux, and Jenkins attended this meeting; Quayle was again absent. During the meeting, Garcia Junior updated the Board on the potential equity transaction to raise capital, including "the various negotiations and different transaction structures and partners he had explored recently, as well as prospects for each."[9]

That evening, Breaux distributed resolutions to the directors, informing them that he would request approval of the resolutions if Carvana successfully completed a common stock offering rather than the preferred stock offering initially discussed. The plaintiffs argue that the switch to a common stock offering came about because indentures in the Company's senior notes limited the amount of common stock into which preferred stock could convert; a preferred stock offering would thus reduce the Garcias' ability to acquire more common equity. This is a reasonable inference. Neither the resolutions nor the other materials sent to the Board indicated that the Company urgently needed to raise capital. On March 26, 2020, Carvana's Class A common stock closed at $56.55 per share.

Early in the morning on Friday, March 27, 2020, the Board held a 40-minute telephonic meeting to approve the Direct Offering. Garcia Junior led the Board in a

---

[8] *Id.* ¶ 137.

[9] *Id.* ¶ 138.

discussion of "the timing, strategy, and progress of the Company's potential equity transaction to raise capital," and Garcia Junior "summarized . . . the various negotiations and different transaction structures and partners he had explored recently."[10] Garcia Junior then exited the meeting and did not participate in the vote. Platt was also absent from the meeting.

The remaining Board members in attendance, Maroone, Parikh, Quayle, and Sullivan, discussed that multiple investors had reached out to the Company expressing willingness to participate in a capital raise. Despite this discussion, the Board voted to approve the Direct Offering in substantially the same form described in the resolutions that Breaux had sent earlier. Those resolutions contemplated an investment agreement between the Company and the Garcias, a price range of $45 to $55, and a deal upsize of approximately $600 million. Later that day, Carvana's Class A common stock closed at $49.04 per share.

The resolutions approved by the participating Board members delegated to management the authority to negotiate the terms and provisions of the investment agreements entered into by Direct Offering participants. Thus, Garcia Junior, as the CEO, had the power to determine the terms of a transaction that the Company would enter into with him and his father. While the resolutions state that certain terms of the investment agreements would be subject to Board approval, the Company produced no Section 220

_____

[10] *Id.* ¶ 146.

documents indicating that the Board reviewed or approved any of the investment agreements.

Investor response to the Direct Offering was robust and the deal became "significantly oversubscribed," causing investors to take a smaller allotment than they expected.[11] However, the Garcias were each able to invest $25 million, the full $50 million they had originally been allotted. Garcia Senior and Garcia Junior each purchased 555,556 Class A shares in the Direct Offering.

Garcia Senior "participated behind the scenes in the planning and execution of the very abbreviated process that led up to the Direct Offering."[12] On Saturday, March 28, 2020, Garcia Junior forwarded the stock issuance allocations list to Garcia Senior, referring to the list as "Pretty solid" and stating that they had to "figure out plan on your money."[13]

On March 29, 2020, Garcia Junior informed the Board that Carvana management had decided to sell $600 million worth of stock in the Direct Offering for $45 per share, the lowest price authorized by the Board. The Direct Offering was announced on Monday, March 30, and closed the same day. On March 31, Carvana registered the shares sold in the Direct Offering by filing a prospectus which stated that the capital raised would be used for "general corporate purposes" and that Carvana had "not specifically identified a material single use for which [it] intend[ed] to use the net proceeds."[14] In an April 5th

---

[11] *Id.* ¶¶ 148, 150.

[12] *Id.* ¶ 166.

[13] *Id.* ¶ 167.

[14] *Id.* ¶ 156.

9

update from management, Carvana stated that "in a world with significant national health and macroeconomic uncertainty" the Direct Offering "position[ed] the business defensively for a period of extended stress."[15]

### C. Post-Offering Developments

On May 6, 2020, Carvana released excellent first quarter earnings for 2020, including a "43% year-over-year increase in car sales and a 45% increase in year-over-year revenue."[16] Garcia Junior noted on an analyst call that he believed that Carvana would ultimately benefit from the COVID-19 pandemic since "e-commerce will be a relative outperformer during this time and coming out of this time."[17] On May 7, the day after first quarter earnings, Carvana's stock price closed at $97.67, more than double the price of the Direct Offering that occurred less than two months earlier. Carvana's strong first quarter performance would have been known to the Garcias before the Direct Offering.

On May 18, 2020, Carvana announced a public offering of five million Class A shares at a price of $92 per share. The Board approved this transaction in a 14-minute meeting featuring a presentation from Garcia Junior as to the size and price of the transaction.

On June 15, Garcia Senior entered into a Rule 10b5-1 trading plan whereby he would be able to realize profits from Carvana stock purchased in the Direct Offering.

---

[15] *Id.* ¶ 158.

[16] *Id.* ¶ 168.

[17] *Id.*

10

On August 6, 2020, Carvana announced strong earnings for the second quarter, including "25% year-over-year increase in retail units sold, a 13% year-over-year increase in revenue, and a 9% year-over-year increase in total gross profits."[18]  Carvana also reported strong growth late in the quarter and expected its sales strength to continue into July.  Garcia Junior noted the increased demand for Carvana's cars as part of a letter to shareholders, highlighting that 60% of survey respondents were "open to buying a car online," up from 32% in a prior survey.[19]  The day after the positive second quarter earnings announcement, Carvana's stock price rose 28% to $222.99.

Under the Securities and Exchange Act of 1934, the Garcias were required to disgorge any profits from the sale of Carvana stock that took place within the "short-swing" period, or six months from the Direct Offering.  The short-swing period expired on September 30, 2020.  Following this period, Garcia Senior sold millions of shares on the open market between October 2 and December 31, 2020, pursuant to his trading plan.  Additionally, Garcia Senior sold 2 million shares on December 2, for a total of $478.4 million.  Garcia Senior has since modified his trading plan twice and he continued to sell Carvana shares throughout 2021 while remaining Carvana's controlling stockholder.

### D.    This Litigation

On May 28, 2020, Plaintiffs St. Paul Electrical Construction Pension Plan, St. Paul Electrical Construction Workers Supplemental Pension Plan (2014 Restatement), and

---

[18] *Id.* ¶ 173.

[19] *Id.* ¶ 174.

11

Retirement Medical Funding Plan for the St. Paul Electrical Workers (collectively, "St. Paul") filed the original complaint against Carvana challenging the Direct Offering.[20] St. Paul amended their plenary complaint on August 17, 2020.[21]

On July 27, 2020, City of Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust ("Hallandale"), served a demand for books and records on the Company pursuant to Section 220 of the Delaware General Corporation Law.[22] Carvana agreed to produce certain documents in response, which Hallandale used to file a plenary complaint on October 13, 2020.[23]

On May 18, 2020, Anthony Franchi served a demand to inspect books and records on the company, and on June 18, 2020, stockholder Construction Industry and Laborers Joint Pension Trust for Southern Nevada ("Laborers") did the same.[24] After negotiating the scope of production but failing to reach a resolution, Franchi and Laborers filed a Section 220 complaint on August 17, 2020.[25] That action settled on November 16, 2020,[26] and Franchi and Laborers filed their own plenary complaint on December 3, 2020.[27]

---

[20] Dkt. 1.

[21] Dkt. 15.

[22] C.A. No. 2020-0887-KSJM, Dkt. 1 ¶ 9.

[23] Dkt. 24, Mot. to Consol. ¶¶ 3, 5.

[24] C.A. No. 2020-0676-AGB, Dkt. 1 ¶¶ 86, 88.

[25] *Id.* ¶¶ 90–91.

[26] C.A. No. 2020-0676-AGB, Dkt. 15.

[27] C.A. No. 2020-1028-KSJM, Dkt. 1.

The court consolidated the three plenary actions on January 4, 2021.[28]  On May 13, 2021, St. Paul, Franchi, and Laborers (collectively, "Plaintiffs") were appointed as Co-Lead Plaintiffs.[29]

Plaintiffs filed the Amended Complaint, which is the operative complaint in this action, on August 20, 2021, asserting two causes of action.  In Count I, Plaintiffs asserted a direct claim for breach of fiduciary duty against all Defendants.  In Count II, Plaintiffs assert a derivative claim for breach of fiduciary duty against all Defendants.  On September 27, 2021, the parties stipulated to dismissal of the direct claim in Count I[30] based on the Delaware Supreme Court's decision in *Brookfield Asset Management, Inc. v. Rosson*.[31]

Defendants each moved to dismiss the remaining count.[32]  The motions were fully briefed,[33] and the court heard oral argument on March 14, 2022.[34]

## II.  LEGAL ANALYSIS

Carvana and Garcia Junior have moved to dismiss pursuant to Court of Chancery Rule 23.1 for failure to plead demand futility and for failure to state a claim under Court of Chancery Rule 12(b)(6).  Garcia Senior joins in the other Defendants' motions and has

---

[28] Dkt. 27.

[29] Dkt. 53.

[30] Dkt. 71

[31] 261 A.3d 1251 (Del. 2021).

[32] Dkt. 73 ("Carvana's Opening Br."); Dtk. 74 ("Garcias' Opening Br.").

[33] Dkt. 78 ("Pls.' Answering Br."); Dkt. 80 ("Carvana's Reply Br."); Dkt. 81 ("Garcias' Reply Br.").

[34] Dkt. 91, Oral Arg. Tr.

separately moved to dismiss pursuant to Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction. Garcia Senior's arguments will be addressed in a separate decision. This decision addresses only Carvana and Garcia Junior's Rule 23.1 and Rule 12(b)(6) arguments.

## A. Demand Is Excused.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[35] "In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[36] Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[37] The demand requirement is a substantive principle under Delaware law.[38] Rule 23.1 is the "procedural embodiment of this substantive principle."[39]

---

[35] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[36] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

[37] *Id.*

[38] *Id.*; *see* Ct. Ch. R. 23.1(a).

[39] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

14

Under Rule 23.1, stockholder plaintiffs must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[40] Stockholders choosing to allege demand futility must meet "heightened pleading requirements,"[41] alleging "particularized factual statements that are essential to the claim."[42] "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences."[43]

Recently, the Delaware Supreme Court affirmed *Zuckerberg* and thereby adopted Vice Chancellor Laster's "universal test" for demand futility that blends elements of the two precursor tests: *Aronson v. Lewis*[44] and *Rales v. Blasband*.[45] When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

---

[40] Ct. Ch. R. 23.1(a).

[41] *Zuckerberg*, 250 A.3d at 876.

[42] *Brehm*, 746 A.2d at 254.

[43] *Id.* at 255.

[44] 473 A.2d 805 (Del. 1984).

[45] 634 A.2d 927 (Del. 1993).

15

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[46]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[47] While the *Zuckerberg* test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[48]

This court evaluates demand futility on a director-by-director basis, determining whether a majority of the board of directors could consider a demand by "count[ing] heads."[49]

In this case, the parties agree that the relevant directors for assessing demand futility as to the Direct Offering were those on the Board when the Amended Complaint was filed.[50] At that time, the Board comprised Garcia Junior, Maroone, Parikh, Platt, Quayle, and Sullivan. Where, as here, a board is even numbered, a plaintiff only needs to demonstrate conflicts as to half of the board.[51]

---

[46] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

[47] *Id.*

[48] *Id.*

[49] *In re EZcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016).

[50] *See* Carvana's Opening Br. at 23; Garcias' Opening Br. at 9–10; Pls.' Answering Br. at 32.

[51] *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 24, 2017) (citing *Gentile v. Rossette*, 2010 WL 2171613, at *7 n.36 (Del. Ch. May 28,

16

Defendants concede, for the purpose of the demand futility analysis, that Garcia Junior is conflicted with respect to the Direct Offering.[52] And Plaintiffs do not challenge the independence or disinterestedness of directors Maroone, Parikh, or Quayle.[53] The parties' dispute thus centers on Sullivan and Platt. Plaintiffs do not allege that Sullivan and Platt were interested in the Direct Offering or that they face a substantial likelihood of liability for approving it. Two of the three *Zuckerberg* inquiries, therefore, are not at issue.

Plaintiffs instead argue that there is reason to doubt the independence of Sullivan and Platt from the Garcias, who received a material personal benefit from the alleged misconduct that would be the subject of the litigation.[54] As discussed more fully below in connection with Garcia Junior's Rule 12(b)(6) argument, it is reasonably conceivable that each of the Garcias received a material personal benefit from the alleged misconduct that would be the subject of a litigation demand. This demand futility analysis thus focuses on the allegations impugning Sullivan's and Platt's independence from the Garcias.

To demonstrate that Sullivan and Platt lacked independence from the Garcias, Plaintiffs must plead "facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either

2010)); *see also Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004) (noting for demand futility purposes that a board evenly divided between interested and disinterested directors could not exercise business judgment on a demand) (citing *Beneville v. York*, 769 A.2d 80, 85–86 (Del. Ch. 2000)).

[52] Carvana's Opening Br. at 24 n.12.

[53] *See* Am. Compl. ¶ 202.

[54] *See* Pls.' Answering Br. at 33–44.

subject to the interested party's dominion or beholden to that interested party."[55] Doubts about a director's independence may arise "because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act non-independently vis à vis an interested director."[56]

### 1. Sullivan

Plaintiffs allege that a history of personal and professional ties between Sullivan and Garcia Senior, along with Carvana director fees, raise a reasonable doubt as to Sullivan's independence from Garcia Senior.

"In order to establish lack of independence, the complaint must create a reasonable doubt that a director is so beholden to an interested director that his or her discretion would be sterilized."[57] Generally, "[t]he naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."[58] The same is true of personal relationships. "[S]ome professional or personal friendships, which may border

---

[55] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016).

[56] *Beam*, 845 A.2d at 1051.

[57] *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006).

[58] *Orman v. Cullman*, 794 A.2d 5, 26–27 (Del. Ch. 2002); *Owens v. Mayleben*, 2020 WL 748023, at *11 (Del. Ch. Feb. 13, 2020) ("These allegations are precisely the kind of 'naked assertion[s] of a previous business relationship' that this court routinely deems insufficient to meet Rule 23.1's particularity standard.") (citing *Orman*), *aff'd*, 241 A.3d 218 (Del. 2020); *see also Highland*, 2006 WL 741939, at *5 (holding that serving with a director on an unaffiliated company's board was insufficient to cast a reasonable doubt on the defendant's independence from that director); *Jacobs v. Yang*, 2004 WL 1728521, at *7 n.33 (Del. Ch. Aug. 2, 2004) (same), *aff'd*, 867 A.2d 902 (Del. 2005).

on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand," but those friendships are not enough to raise a reasonable inference of dependence "without specific factual allegations."[59] "[T]he heightened strength of relationship required to" raise a reasonable doubt as to a director's independence "renders allegations concerning most ordinary relationships of limited value, at most."[60]

The inquiry is similarly exacting when the independence-impugning allegation concerns director fees. "Mere allegations of payment of director fees are insufficient to create a reasonable doubt as to the director's independence."[61] Much more must be shown where director fees alone supply the plaintiffs' challenge.

In this case, the director fees Sullivan received for his service on the Board are far from Plaintiffs' only challenge to Sullivan's independence. Indeed, the fee allegations are eclipsed entirely by Plaintiffs' unusual thick-as-thieves narrative concerning Sullivan and Garcia Senior.

As the factual basis for their arguments challenging Sullivan's independence, Plaintiffs allege that Sullivan was an employee of Garcia Senior in the 1980s, the same period in which Garcia Senior engaged in the conduct that led to his felony conviction. According to Garcia Senior's testimony during the congressional investigation of the

---

[59] *Beam*, 845 A.2d at 1050 (citation omitted).

[60] *Khanna v. McMinn*, 2006 WL 1388744, at *16 (Del. Ch. May 9, 2006).

[61] *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *15 (Del. Ch. Jan. 21, 2022) (citing *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 360 (Del. Ch. 1998)).

Lincoln Savings & Loan scandal, Sullivan was one of just four people who attended the initial meeting between Garcia Senior and Charles Keating, the central figure in the scandal.[62]

Separately, Sullivan was censured by the NYSE due to actions he took on behalf of Garcia Senior during this period. In 1987, Garcia Senior purchased a regional brokerage company called Young Smith & Peacock, Inc. ("YS&P") and brought on Sullivan as its managing director and executive vice president.[63] After YS&P incurred substantial losses during the October 1987 "Black Monday" crash, it borrowed $2.5 million from another Garcia-controlled entity. Although the NYSE expressly forbade YS&P from repaying this loan due to the firm's poor financial situation, Sullivan did so indirectly by purchasing a $2.4 million note from the same Garcia entity in January 1988. As a result of this conduct, Sullivan was censured by the NYSE in 1993 and suspended from holding any supervisory role with any NYSE member for six months.

The NYSE censure could have been career-ending for Sullivan, but it was not. In 1995, Garcia Senior hired Sullivan as a consultant for DriveTime. Garcia Senior later named Sullivan President of DriveTime, and Sullivan served in that capacity from 1996 to 2004. When Garcia Senior stepped down as CEO of DriveTime in 1999, Sullivan stepped into that role. Sullivan also served as Vice Chairman of the DriveTime board from 2004 to 2007.

---

[62] Am. Compl. ¶ 48.

[63] *Id.* ¶ 49.

In 2001, during the market dislocation following the tragic events of September 11, 2001, Garcia Senior and Sullivan launched a tender offer to take DriveTime private. The tender offer closed in January 2002 and was followed by a short-form merger in March 2002. Immediately following the short-form merger, Garcia Senior and Sullivan were the sole owners of DriveTime.

After Sullivan stepped down as DriveTime's Vice Chairman in 2007, he launched a travel media company called AFAR Media LLC ("AFAR"). Sullivan invested about $10 million of his own funds in AFAR. It is reasonable to infer that Sullivan tied up much of his net worth in the investment because Sullivan stated during a 2009 television interview that he was "all in" and "counting on [AFAR] working."[64] Sullivan continues to lead AFAR as its CEO.

It is reasonable to infer that Garcia Senior made a significant investment in AFAR. In 2012, Folio Magazine reported that Garcia Senior was a "primary investor" in the enterprise.[65] In 2016, Garcia Senior was one of just three board members of AFAR. The travel media company struggled financially during the pandemic, rendering it reasonably conceivable that Garcia Senior's support of AFAR is of continued importance to Sullivan. Also, in a Carvana director independence questionnaire dated January 2, 2020, Sullivan wrote that he was "a friend of [Garcia Senior], and he is an investor in AFAR Media."[66]

---

[64] *Id.* ¶ 59.

[65] *Id.* ¶ 54.

[66] *Id.* ¶ 56.

These allegations collectively demonstrate the "heightened strength of relationship required to find that"[67] Sullivan's "discretion would be sterilized" when considering a demand to pursue action against Garcia Senior.[68] Put succinctly, it is reasonably conceivable that Sullivan might be incapable of impartially considering a demand to sue the man who allegedly saved his career, helped generate his personal wealth, and financially shores his current livelihood.

The facts of this case are similar to those of *Marchand v. Barnhill*, where the Delaware Supreme Court found that a plaintiff had adequately alleged that a director, Rankin, lacked independence from a controller, Kruse, due to personal and professional ties.[69] The court in *Marchand* based this conclusion on three allegations: (i) "Rankin started as [Kruse's father's] administrative assistant and, over the course of a 28-year career with the company, rose to the high managerial position of CFO;" (ii) "Rankin was added to Blue Bell's board in 2004, which one can reasonably infer was due to the support of the Kruse family;" and (iii) "the Kruse family spearheaded charitable efforts that led to a $450,000 donation to a key local college, resulting in Rankin being honored by having Blinn College's new agricultural facility named after him."[70]

The allegations in *Marchand* largely track the allegations here: (i) Sullivan received his first post-NYSE censure job from Garcia Senior at DriveTime and rose through the

---

[67] *Khanna*, 2006 WL 1388744, at *16.

[68] *Rales*, 634 A.2d at 936.

[69] *Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019).

[70] *Id.* at 818–19.

ranks to eventually become CEO, President, and a director of the company over a twelve-year period; (ii) Sullivan was added to the Board which, like in *Marchand*, reasonably implies that such an appointment was due to support from Garcia Senior; and (iii) Sullivan received a large, potentially multi-million-dollar investment from Garcia Senior into Sullivan's AFAR media company, which is perhaps a greater connection than the charitable contribution at issue in *Marchand*. This is without even considering Sullivan's censure by the NYSE for actions he took to benefit Garcia Senior or the taking private of DriveTime after 9/11.

As was the case in *Marchand*, Plaintiffs' allegations "support a reasonable inference that there are very warm and thick personal ties of respect, loyalty, and affection" between Sullivan and Garcia Senior.[71]

Plaintiffs' allegations stand in contrast with the allegations of *Zimmerman v. Crothall*,[72] on which Defendants rely. In *Zimmerman*, a unitholder of Adhezion Biomedical LLC challenged the Adhezion board's decision to approve a series of convertible note issuances in which certain insiders, including the company's CEO and chairman, participated.[73] The court analyzed the plaintiff's allegations challenging director independence to determine whether the entire fairness standard of review should apply.[74] The court rejected the argument that one of the directors lacked independence from the

---

[71] *Id.* at 819.

[72] 2012 WL 707238 (Del. Ch. Mar. 27, 2012).

[73] *Id.* at *3–4.

[74] *Id.* at *12.

CEO/chairman based on allegations that the two "were good friends, that their families socialized, and that the two had worked closely together on previous occasions, including in founding a start-up company."[75]

The Company argues Plaintiffs' allegations as to Sullivan are as makeweight as those deemed insufficient in *Zimmerman*.[76]  Not so.  Sullivan is alleged to have a much closer relationship to Garcia Senior than mere friendship; Sullivan once violated NYSE rules and received censure on Garcia Senior's behalf.  It is reasonably conceivable that Garcia Senior later saved his career, indirectly generated a majority of Sullivan's personal wealth, and invested in and sits on the board of Sullivan's new company.  The extent of this relationship is far greater than the one discussed in *Zimmerman*, and it is reasonable to conclude that Sullivan is not independent from Garcia Senior for demand futility purposes.

In search of a contrary outcome, Defendants argue that individual portions of Plaintiffs' narrative fail to impugn Sullivan's independence.  Because the allegations fail to impugn Sullivan's independence when analogized to other cases individually, they cannot suffice when analyzed as a whole, Defendants say.  Defendants' divide-and-conquer approach is legally untenable, as this court "must consider plaintiff's allegations 'in their totality and not in isolation from each other.'"[77]  This court looks at whether the

---

[75] *Id.* at *13.

[76] Carvana's Opening Br. at 41.

[77] *In re BGC P'rs, Inc.*, 2019 WL 4745121, at *9 (Del. Ch. Sept. 30, 2019) (quoting *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015)).

24

"constellation of facts," taken together, create a reasonable doubt about a director's ability to objectively consider a demand.[78]

Defendants' efforts to minimize the force of Plaintiffs' allegations when viewed in isolation from one another are unpersuasive in any event. For example, Defendants argue that Garcia Senior's AFAR investment does not render Sullivan beholden to Garcia Senior by analogizing to *In re Goldman Sachs Group, Inc. Shareholder Litigation*[79] and *Flannery v. Genomic Health, Inc.*[80] Both cases are distinguishable.

In *Goldman Sachs Group*, the plaintiff argued that a director lacked independence from Goldman Sachs Group ("Goldman") because Goldman Sachs provided "billions of euros in financing" to an established company where the director was Chairman and CEO.[81] The court rejected this argument, holding that the plaintiff failed "to plead facts that show anything other than a series of market transactions occurred between [the director's company] and Goldman."[82] The court highlighted that the plaintiffs did not plead that the director's company "receiv[ed] a discounted interest rate on the loans from Goldman, that [the director] was unable to receive financing from any other lender, or that loans from Goldman compose a substantial part of [the director company's] funding."[83]

---

[78] *Id.* (quoting *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at \*18 (Del. Ch. Mar. 19, 2018)).

[79] 2011 WL 4826104 (Del. Ch. Oct. 12, 2011).

[80] 2021 WL 3615540 (Del. Ch. Aug. 16, 2021).

[81] *Goldman Sachs Gp.*, 2011 WL 4826104, at \*12.

[82] *Id.*

[83] *Id.*

Defendants argue that, like in *Goldman Sachs*, Garcia Senior made an "unspecified investment" in AFAR that does not destroy Sullivan's independence. But in *Goldman Sachs*, a large investment bank invested in an established institution with which it had no personal ties. By contrast, here, Garcia Senior individually invested in a fledgling media company due to pre-existing personal ties with the founder. Moreover, it is reasonably conceivable that Garcia Senior's portion of the investment was a "substantial part" of AFAR's funding, which was not the case in *Goldman Sachs*.[84]

In *Flannery*, the plaintiff alleged that two directors, Parker and Fuchs, lacked independence from the controller entities due to relationships between the controller entities and the directors' primary employers. As to Parker, the plaintiffs alleged that the controller entities were significant stockholders of a company, Tricida, where Parker served as an executive, and significant investors in other companies where Parker was a director.[85] The court rejected this argument, holding that the allegations failed to raise a reasonable doubt as to Parker's independence because there was "no indication the [controller entities] had substantial say in [Parker's] compensation or job prospects at Tricida and the mere fact he served with or was appointed by the [controller entities] as a director at companies in which they invest does not, alone, move the needle."[86] As to Fuchs, the plaintiff alleged that the controller entities invested in Fuchs' primary employer

---

[84] *Id.*

[85] *Flannery*, 2021 WL 3615540, at *16.

[86] *Id.*

and appointed Fuchs to various board seats.[87] The court rejected this argument as well, noting that the plaintiff failed to allege facts about how the controller entities had "unilateral power" or "substantial sway[] over Fuchs' compensation or future job prospects," and that appointment to a board seat did not support a reasonable inference that Fuchs was beholden.[88]

Defendants argue that, like in *Flannery*, "Plaintiffs plead no facts demonstrating that, by virtue of his prior investment, Garcia Senior has substantial sway over . . . Sullivan or AFAR."[89] Defendants contend that *Flannery* stands for the proposition that "there is no basis to find that the director is beholden to the controller" in the absence of "any indication that a controller has substantial say in a director's compensation or job prospects."[90] In *Flannery*, however, the controller entities lacked the personal ties alleged here. Garcia Senior is not a stockholder or mere investor in AFAR, but rather, one of two initial investors in AFAR and one of three directors on the board; Sullivan is not a mere executive, but rather, the founder who risked much of his net worth by investing into AFAR. Thus, Garcia Senior has greater, and arguably "substantial" say over Sullivan by virtue of his investment and role in AFAR. More to the point, the analysis in *Flannery* looked solely at whether the controller's investment created the inference of a disabling influence. Here, the

---

[87] *Id.* at *15.

[88] *Id.*

[89] Carvana's Opening Br. at 40.

[90] Carvana's Reply Br. at 22.

controller's investment is coupled with other facts suggesting a lack of independence such as significant personal and business ties.

Defendants further argue that Sullivan's past employment by Garcia Senior is inconsequential to the analysis. They observe that Sullivan's "employment with DriveTime ended over ten years before he joined the Carvana Board . . . [and] five years before Carvana was even formed."[91] Defendants cite two cases for the proposition that previous employment with a controller is not a disabling conflict, *In re Western National Corp. Shareholders Litigation*[92] and *Teamsters Union 25 Health Services & Insurance Plan v. Baiera*.[93] Both are distinguishable.

In *Western National*, the plaintiff argued that a director lacked independence from the controlling stockholder, American General, where the director had a "twenty-three-year career at American General" and "maintained close social and professional ties with his colleagues there."[94] The *Western National* court reasoned that these facts, standing alone, "do not warrant the inference that [the director] favored the fortunes of American General over those of a company in which he holds substantial equity and has served as executive chairman for its entire existence as a publicly-held entity."[95]

---

[91] Carvana's Opening Br. at 38.

[92] 2000 WL 710192 (Del. Ch. May 22, 2000).

[93] 119 A.3d 44 (Del. Ch. 2015).

[94] *W. Nat'l*, 2000 WL 710192, at *12.

[95] *Id.*

28

In *Baiera*, the plaintiff argued that a director lacked independence from a controlling stockholder, Travelport, where the director was an executive of Travelport for 16 years, including four years as CEO and President, and was named a director of the company controlled by Travelport within three months after his employment ended.[96]  The *Baiera* court rejected this argument, holding that "an employment relationship that ended . . . almost three years before [the] action was filed" and a "loyalty appointment" to a board seat by a controller were not sufficient to overcome a director's presumption of independence.[97]

Neither *Western National* nor *Baiera* involved the facts alleged here.  While the length of the employment relationships discussed in those cases is similar and compares favorably to the allegations in this case, the substance of the alleged relationship between Garcia Senior and Sullivan is far deeper than mere former employment for all of the reasons discussed above.[98]

---

[96] *Baiera*, 119 A.3d at 59.

[97] *Id.* at 60.

[98] *See also In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923, at *12 (Del. Ch. June 30, 2005) ("Latiolais had worked for the Common Directors for almost twenty years and had become a wealthy individual in their employ. To argue that Latiolais was independent of the Common Directors because he formally severed ties with some Freeport entities does not take into account the nature and extent of his overwhelming, career-long involvement with Freeport entities, including the entire span of MOXY's life.  Delaware law recognizes that such extensive ties can operate as an exception to the general rule that past relationships do not call into question a director's independence."). Defendants also cite *Owens*, 2020 WL 748023, at *11, but that case is similarly inapposite. In *Owens*, a stockholder-plaintiff argued that a director was not independent of two other board members, the president/CEO and scientific advisor, for demand futility purposes because he had served with those board members at another company the president/CEO co-founded, and he received $839,700 when the other company was sold.  The court found

29

In sum, Plaintiffs have pled a constellation of facts that, taken together, create a reasonable doubt about Sullivan's ability to objectively consider a demand to pursue litigation against Garcia Senior.

The logic extends to Garcia Junior, who controls Carvana with Garcia Senior. The particularized facts suggest that the Garcias are close—they own Carvana together and communicated regarding the Direct Offering. This closeness creates a reasonable doubt about Sullivan's ability to objectively consider a demand to pursue litigation against Garcia Senior's son, particularly litigation for the same wrongdoing alleged against Garcia Senior. Plaintiffs have therefore adequately pled that Sullivan is not capable of impartially considering a demand to pursue litigation in connection with the Direct Offering against either Garcia.

### 2. Platt

Plaintiffs allege that personal and professional ties between Platt and the Garcias, although a degree less significant than Sullivan's alleged ties to Garcia Senior, nevertheless raise a reasonable doubt as to Platt's independence from the Garcias,

As to personal and professional ties, Plaintiffs allege that Platt was Managing Director of Greenwich Capital and its relationship banker for Greenwich Capital's engagement with the Garcias and DriveTime in the late 1990s and early 2000s. That

---

that those allegations were "precisely the kind of 'naked assertion[s] of a previous business relationship' that this court routinely deems insufficient to meet Rule 23.1's particularity standard." *Id.* at *11 (citing *Orman*, 794 A.2d at 26–27). As discussed above, Sullivan's alleged relationship with Garcia Senior is far more extensive and substantial than the relationship alleged in *Owens*.

relationship appears to have been lucrative; in the course of a few years, Greenwich Capital and DriveTime entered into financing arrangements totaling hundreds of millions of dollars in value. It is fair to infer that these activities would have generated significant fees for Greenwich Capital and, in turn, would have inured to Platt's benefit.

Plaintiffs allege that Platt gave Garcia Junior his first post-college job in 2005, employing him as an associate at Greenwich Capital in the same area of consumer credit-based investments as Platt. Garcia Junior allegedly returned the favor when Platt's son was a college freshman, hiring him for an internship at Carvana in 2015. During this internship, Platt's son was given the opportunity to make presentations to Carvana executives. Platt's son could have been a particularly impressive intern who earned his spot and the opportunities that followed. But the procedural posture requires the court to draw plaintiff-friendly inferences. Drawing such inferences here, it is reasonable to infer that, but for Platt's relationship with the Garcias, Platt's son would not have been given the same opportunities as an intern.

Garcia Senior appointed Platt as a director for three different Garcia-controlled entities. First, Garcia Senior appointed Platt as a DriveTime director in February 2014. The same year, he placed Platt on the board of DriveTime's sister corporation, DT Acceptance Corporation. When Carvana went public in 2017, Garcia Senior moved Platt over from the DriveTime board to Carvana's board. As a director on the Carvana Board, Platt has earned more than $1 million in compensation over the last four years.

Platt's relationship with the Garcias has given Platt access to investment opportunities not available to the general public, from which Platt has made tens of millions

31

of dollars. In 2015, the Garcias caused Carvana Group, LLC to grant Platt 200,000 Class B common units, each of which can be converted to 0.8 shares of Carvana's Class A common stock, under an equity incentive plan. The Garcias did not extend this benefit to any other Carvana director. Indeed, only six people—all Company employees—other than the Garcias and Platt hold Class B units. In the last two years alone, Platt has pocketed more than $24 million from the sale of Class A shares he converted from his Class B units. Platt still owns at least 76,876 Class B common units, convertible into 61,500 Class A shares currently worth more than $16.5 million.

Similarly, the Garcias allowed Platt's investment entity—GV Auto Group I LLC—to invest in Carvana Group, LLC by purchasing 1,672,179 Class C preferred units. The Garcias invited only two other people—both close allies—to purchase such units. In connection with the Company's 2017 IPO, all of the Class C preferred units converted into Class A common units on a one-to-one basis, and for each Class A common unit then held, members were issued 0.8 Class B common shares of Carvana. The Class A common units are exchangeable for 0.8 shares of Carvana Class A common stock. On numerous occasions, Platt has exchanged many of these Class A common units for Carvana Class A common stock and then sold them for millions of dollars. Also in connection with the IPO, Platt and GV Auto I, LLC entered into a tax receivable agreement with Carvana whereby they, along with other LLC unitholders, receive 85% of the benefits that Carvana realizes under certain circumstances.

These allegations, in the aggregate, raise a reasonable doubt as to Platt's independence from the Garcias. The most significant supporting allegations for this

32

conclusion are the grant of Class B units to Platt, two-thirds of which he has converted and sold for $24 million, and the preferential investment opportunities he has received to invest in Carvana Group, LLC.

This court has long recognized that "past benefits conferred by [a controller] . . . may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised."[99] For example, in *In re The Limited, Inc.*, the court found that a director could not impartially consider a demand to sue the controller where, when the director was a university president several years earlier, the director successfully solicited a $25 million donation from the controller for the university.[100] The court held that "a gift of that magnitude can reasonably be considered as instilling in [the director] a sense of 'owingness' to" the controller, despite the fact that the funds were not given to the director personally.[101]

Here, Platt is alleged to have already made more than $24 million by selling converted Class B units that he was directly granted by the Garcias, and he still has nearly a third of those granted Class B units remaining. This is in addition to his director compensation and the benefits that he received from being given an exclusive opportunity to invest in Carvana Group, LLC. These allegations, standing alone, are sufficient to raise a reasonable doubt as to Platt's independence from the Garcias under this court's holding

---

[99] *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001).

[100] 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002).

[101] *Id.*

33

in *The Limited* and numerous other cases in which extraordinary gifts sufficed to impugn a director's independence.[102]

Defendants argue that "Plaintiffs' allegations establish, at most, that . . . Platt has received ordinary equity incentive compensation in exchange for his service to Carvana and invested an undisclosed sum of money in Carvana on behalf of himself and others in exchange for stock and LLC units."[103] Yet Defendants offer no explanation for why the other Board members have never received this "ordinary equity incentive compensation," nor why they were not also invited to participate in an exclusive opportunity to purchase Class C preferred units of Carvana Group, LLC.

Instead, Defendants rely on numerous decisions of this court establishing that directors owning stock in the companies they serve have "skin in the game," beneficially aligning their interests with other company stockholders to maximize corporate value and incentivizing compliance with fiduciary duty over loyalty to a third party. For instance, they point to *In re Walt Disney Co. Derivative Litig.*, in which this court held that a highly paid officer and director, with stock worth $2.1 billion, was independent of the

---

[102] *See*, *e.g.*, *Marchand*, 212 A.3d at 820 (finding lack of independence where controller and his family spearheaded a campaign to name a building after the director, which supported the director's "important debt of gratitude and friendship to the" controller); *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *17–18 (Del. Ch. Mar. 28, 2018) (holding director not independent after being gifted by the controlling stockholder the first Tesla Model S and the second Tesla Model X ever made); *Off v. Ross*, 2008 WL 5053448, at *11 (Del. Ch. Nov. 26, 2008) (finding director beholden to controller for past acts including donation of a prodigious sum to the university where the director was dean, coupled with the fact that the controller who made the donation became the eponym of the benefiting institution).

[103] Carvana's Reply Br. at 14–15 (citations omitted).

chairman/CEO because "[t]he only reasonable inference that I can draw about [the director] is that he is an economically rational individual whose priority is to protect the value of his Disney shares, not someone who would intentionally risk his own and his family's interests in order to placate [the chairman/CEO]."[104] That case is inapposite because Platt is alleged to have received millions of dollars in stock as a gift from the Garcias that other directors did not receive, not merely to own a large stake in the Company. The rest of the cases Defendants cite for this point are distinguishable on the same grounds.[105]

Although the allegations regarding the large stock gift and exclusive investment opportunities shine brightest in Platt's constellation of facts raising a reasonable doubt as to his independence from the Garcias, there are other stars as well. These include: (i) Platt securing a position for Garcia Junior and Garcia Junior securing a position for Platt's son; (ii) Platt's appointment to the boards of numerous Garcia-controlled entities and accompanying director compensation; and (iii) the historical relationship between Platt and Garcia Senior while Platt was DriveTime's primary relationship banker at Greenwich Capital. These allegations all heighten the doubts raised by Plaintiffs' primary argument.

Defendants argue that the allegations about the circumstances of Garcia Junior's hiring at Greenwich Capital and Platt's son's hiring at Carvana are insufficiently specific,

---

[104] 731 A.2d 342, 356 (Del. Ch. 1998).

[105] *See Zuckerberg*, 250 A.3d at 897 (finding that a director who invested in the company early was independent of the founder in circumstances where there was no allegation that he had received a large gift of stock); *Owens*, 2020 WL 748023, at *10 (finding that directors' stock ownership was insufficient to establish lack of independence from the president/CEO and scientific advisor in circumstances where there was no allegation that they had received a large gift of stock).

recent, or material to support a reasonable doubt as to Platt's ability to consider a demand to sue the Garcias. As this court has held, however, while "the actual extent of these relationships is not altogether clear at this point in the litigation, the existence of these interests and relationships is enough to defeat a motion to dismiss."[106]

Defendants also argue, correctly, that allegations about board appointments,[107] director compensation,[108] and historical business transactions[109] are often insufficient, standing alone and without specific reference to materiality, to rebut the presumption of director independence at the pleading stage. As the court has repeated in this decision, however, none of the allegations about Platt's relationship with the Garcias stands alone;

---

[106] *In re New Valley Corp.*, 2001 WL 50212, at *8 (Del. Ch. Jan. 11, 2001) (footnote omitted).

[107] *See* Carvana's Reply Br. at 7 (citing *Aronson*, 473 A.2d at 816 ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director.") and *Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015) (noting that "the mere fact that one was appointed by a controller" does not overcome a director's presumption of independence")).

[108] *See* Carvana's Opening Br. at 33–34 (citing *Teamsters Local 237 Additional Sec. Benefit Fund v. Caruso*, 2021 WL 3883932, at *16 (Del. Ch. Aug. 31, 2021) (refusing to find lack of independence where the plaintiffs did not allege that a director drew a material percentage of her income based on her relationship with the chairman/CEO or that her director fees were material to her)); Carvana's Reply Br. at 12 (citing *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *15 (Del. Ch. Jan. 14, 2010) ("[D]irector compensation alone cannot create a reasonable basis to doubt a director's impartiality.")).

[109] *See* Carvana's Reply Br. at 11 (citing *The Ltd.*, 2002 WL 537692, at *5 ("The Complaint is devoid of any allegations asserting (or from which an inference can reasonably be drawn, for that matter) that the $400,000 annual revenue that Audio receives from its dealings with The Limited and its affiliates was material to Audio's business. Moreover, the Complaint does not allege how Kollat, as 'a principal,' may have benefited from any portion of those revenues. Accordingly, the plaintiffs have also failed to plead particularized facts raising a reasonable doubt as to Kollat's independence.")).

it is together that they establish a reasonable doubt that he can impartially consider a demand to pursue litigation against them.

In sum, Plaintiffs have pled particularized facts raising a reasonable doubt as to Platt's independence from the Garcias.

Having shown that both Platt and Sullivan are incapable of impartially considering a litigation demand, Plaintiffs satisfy the third prong of *Zuckerberg*. Accordingly, Defendants' motion to dismiss Count II pursuant to Rule 23.1 is denied.

### B.    The Complaint States A Claim.

The Garcias moved to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim. Given that Garcia Senior's motions will be discussed in a separate decision, this portion of the decision analyzes only whether the Amended Complaint states a claim against Garcia Junior.

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[110] On a Rule 12(b)(6) motion, the court accepts "all well-pleaded factual allegations in the Complaint as true, [and] accept[s] even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[111] The court "is not, however, required to accept as true conclusory allegations 'without specific supporting factual allegations.'"[112] The court draws "all reasonable inferences in

---

[110] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (citation omitted).

[111] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[112] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)).

favor of the plaintiff, and den[ies] the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[113]

Garcia Junior advances two arguments for dismissal under Rule 12(b)(6). First, he argues that he "recused himself and did not participate in the approval of the Direct Offering."[114] Although briefing frames Garcia Junior's action as "recusal," the facts suggest it was merely abstention.[115] This decision thus describes Garcia Junior's first argument in terms of abstention. Second, Defendants argue that the Direct Offering is subject to the business judgment standard of review rather than entire fairness, and that the Amended Complaint fails to state a claim under the business judgment standard.[116]

### 1.    Garcia Junior's Abstention Does Not Result In Dismissal.

Generally, "a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve that transaction was wrongful."[117] This principle has been articulated to mean

---

[113] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor*, 812 A.2d at 896–97).

[114] Garcias' Opening Br. at 20.

[115] The term "recusal" connotes withdrawal from the entire process, whereas "abstention" connotes withdrawing from the final decision. *Compare Recusal*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Removal of oneself as judge or policy-maker in a particular matter, esp. because of a conflict of interest."), *with Abstention*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The act of not voting for or against something.").

[116] Garcias' Opening Br. at 20.

[117] *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at *2 (Del. Ch. Mar. 9, 1995) (citing *Citron v. E.I. du Pont de Nemours & Co.*, 584 A.2d 490, 499 (Del. Ch. 1990)).

that "a 'director can avoid liability for an interested transaction by totally abstaining from any participation in the transaction.'"[118]

Abstaining from a vote, however, does not provide a defendant with a get-out-of-jail-free card that can be played at the motion to dismiss stage. This court has explained that "no *per se* rule unqualifiedly and categorically relieves a director from liability solely because that director refrains from voting on the challenged transaction."[119] The abstention doctrine "often implicates factual questions that cannot be resolved on the pleadings."[120]

Decisions of this court have enumerated a non-exhaustive list of scenarios that preclude the application of the abstention doctrine. For example, a court may hold a director liable, even if the director abstained from the formal vote to approve the transaction, if the director (i) was "closely involved with the challenged [transaction] from the very beginning and the transaction was rendered unfair based, in large part, on the director's involvement;"[121] (ii) "play[ed] a role in the negotiation, structuring, or approval of the proposal;"[122] or (iii) was "deliberately absent . . . from the directors' meeting at

---

[118] *In re Coty Inc. S'holder Litig.*, 2020 WL 4743515, at *9 (Del. Ch. Aug. 17, 2020) (emphasis omitted) (quoting *In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 1224556, at *15 (Del. Ch. Mar. 15, 2019)).

[119] *Tri-Star*, 1995 WL 106520, at *3.

[120] *Coty*, 2020 WL 4743515, at *9.

[121] *Voigt v. Metcalf*, 2020 WL 614999, at *27 (Del. Ch. Feb. 10, 2020) (cleaned up).

[122] *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. Ch. 2007).

which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability."[123]

"Given the factual nuances underlying [the abstention doctrine], it is no surprise that the leading cases have not addressed the issue at the pleadings stage, but rather in post-trial rulings or on a motion for summary judgment."[124]

Plaintiffs have sufficiently alleged that Garcia Junior played a role in the negotiation, structuring, and approval of the Direct Offering such that his abstention supplies no automatic victory at the pleadings stage. Plaintiffs allege that Garcia Junior "shepherded the [Direct] Offering" from "conception to its execution over the course of a few hurried days."[125] Specifically, Garcia Junior participated in early discussions with partners about a capital raise, "reviewed lists of selected holders to be invited to participate in the Direct Offering," "led the discussions of the Direct Offering at every single board meeting," and set the price of the Direct Offering within the range of prices provided by the Board.[126] Any one of these facts by itself would be enough to give this court pause in applying the abstention principle. The sum of these allegations makes it inappropriate to dismiss the complaint against Garcia Junior due to his abstention.[127]

---

[123] *Tri-Star*, 1995 WL 106520, at *3.

[124] *Voigt*, 2020 WL 614999, at *27 (quoting *Pilgrim's Pride*, 2019 WL 1224556, at *17).

[125] Pls.' Answering Br. at 51.

[126] *Id.*; *see also* Am. Compl. ¶¶ 120, 122–46, 147 n.21.

[127] *Valeant*, 921 A.2d at 753.

## 2. It Is Reasonably Conceivable That The Appropriate Standard Of Review Is Entire Fairness.

"[I]n nearly all pleadings stage challenges to the viability of a breach of fiduciary duty claim in the corporate context, deciding the proper standard of review . . . will be outcome determinative."[128]

Plaintiffs ask the court to consider the Direct Offering through the lens of entire fairness.[129] Entire fairness, Delaware's most onerous standard, applies when a controlling stockholder engages in a conflicted transaction, or "there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority."[130] "If a board is evenly divided between compromised and non-compromised directors, then the plaintiff has succeeded in rebutting the business judgment rule."[131] Because the entire fairness analysis "is fact intensive, it is rare the court will dismiss a fiduciary duty claim on a Rule 12(b)(6) motion when entire fairness is the governing standard of review."[132]

This decision already determined that Plaintiffs are entitled to a pleading stage inference that Sullivan and Platt are beholden to the Garcias. With Garcia Junior, the conflicted directors total half the Board. Garcia Junior argues, however, that the business judgment standard, rather than entire fairness, governs because he was not conflicted with

---

[128] *Tornetta v. Musk*, 250 A.3d 793, 805 (Del. Ch. 2019).

[129] Pls.' Answering Br. at 4.

[130] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013).

[131] *Frederick Hsu Living Tr.*, 2017 WL 1437308, at *26.

[132] *Musk*, 250 A.3d at 812.

41

respect to the Direct Offering. According to Defendants, Garcia Junior suffered voting and economic dilution as a result of the Direct Offering.[133] The Garcias owned a majority of the economic value of Carvana yet obtained only 8.3% of the stock in the Direct Offering. Thus, they had every incentive to maximize the price of the Direct Offering.

At the pleading stage, drawing all reasonable inferences in Plaintiffs' favor, it is reasonably conceivable that the Garcias received a non-ratable benefit not shared by the public stockholders, and that this benefit was material to them. The big picture here is that, as alleged in the Amended Complaint, the Garcias pushed forward in two-and-a-half days a capital raise that the Company might not have needed. Garcia Junior chose who participated in the deal. The Garcias were able to participate. The public was excluded. The deal was executed at a per share price that was less than the market value of Carvana common stock on the day it was consummated. Although Defendants argue that the Garcias were diluted as a result of the Direct Offering, it is reasonably conceivable that they were diluted less than the public stockholders. Defendants may ultimately succeed in proving their factual narrative at trial. For present purposes, plaintiff-friendly inferences foreclose it.

Having determined that half of the Carvana Board lacks independence from the Garcias, who received a non-ratable benefit from the Direct Offering not shared by the public stockholders, the entire fairness standard presumptively applies. Given the fact-intensive nature of the entire fairness inquiry, dismissal is inappropriate.

---

[133] Garcias' Reply Br. at 16.

Accordingly, Garcia Junior's motion to dismiss pursuant to Rule 12(b)(6) is denied.

## III. CONCLUSION

Carvana and Garcia Junior's motion to dismiss under Court of Chancery Rule 23.1 is DENIED. Carvana and Garcia Junior's motion to dismiss under Court of Chancery Rule 12(b)(6) is DENIED.